[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, Ridgefield Homes Realty (Realty), a licensed real estate broker, brought this action to recover a real estate commission allegedly CT Page 845 earned in connection with the sale of residential real property located at One Oscaleta Road in Ridgefield, Connecticut. The defendants are Marylynn Beardsley and Constance Green-Geyer, daughter and mother respectively, and owners of the subject residence. Defendant Beverly Tuma purportedly purchased the property from Beardsley and Geyer and shortly thereafter sold it to defendant, Linda Villano.
In the first count of the revised complaint, it is alleged that Beardsley and Geyer signed a nonexclusive listing contract with Realty agreeing on a commission of 4 percent of any agreed sale price. It is further alleged that Realty showed the Beardsley-Geyer house to Villano and that Villano used a straw person, Tuma, to purchase the home for Villano to avoid the commission and that Beardsley and Geyer participated in this effort to avoid the commission. The second count reiterates the same allegations.
The third count, styled "quantum merit" (sic), alleges that Realty expended time and money showing the house and none of the defendants has paid for the value of these services. The fourth count alleges a conspiracy among all the defendants to avoid payment of a sales commission. In the fifth count, the plaintiff alleges that the above conspiracy was "dishonest, deceitful . . . immoral," etc. and was in violation of the Connecticut Unfair Trade Practices Act (CUTPA).
Beardsley appeared pro se, generally denying the allegations, and alleging a special defense that her signature to the listing agreement was forged. Geyer, Beardsley's mother, generally denied the allegations. Tuma did not appear or plead in the action, and Villano denied the allegations.
The case has not been well pleaded. Each count in the complaint contains repetitive and unnecessary allegations. For instance, the first two counts are identical in all respects. Viewed very charitably, they might be construed as attempting to allege a breach of contract and tortious interference with contract, except that: (1) each count is directed at all defendants when only Beardsley and Geyer were contracting parties, and Tuma and Villano the only potential interferers, and (2) no words connoting breach or interference are contained therein. Furthermore, the complaint repeatedly refers generally to "defendants" when further identification is clearly called for. On the other side, Geyer's answer satisfies itself (but no one else) by simply denying whole counts rather than individual paragraphs and allegations.
The matter was tried before the court on November 7, 2000. Geyer, according to counsel, chose not to appear; her counsel was present but expressly declined to offer evidence or to examine witnesses. Beardsley CT Page 846 was alleged to be possibly mentally retarded, although no evidence of this was offered. In any event, she did not appear, and as noted above, Tuma was in default.
Toni Walsh testified for the plaintiff. Walsh is a licensed broker who obtained the signed, open and nonexclusive listing agreement. She was present when Geyer executed the document and has no recollection of Beardsley signing it. In open court, Geyer's attorney stated that Geyer admitted forging Beardsley's signature, and indeed what appears to be Geyer's initials appear below the purported Beardsley signature.
The listing agreement is, in part, unintelligible. At the outset, it clearly states that if Realty negotiates a sale of the One Oscaleta premises at a selling price of $303,995, it will be owed a commission of 4 percent of that price by the sellers. The next few words read as follows:
 2) Should I/we sell or lease to anyone who saw the property through you or any of your representatives during the term of this agreement, or within 12 months from this agreement ends.
One might infer that the above non-sentence may have intended the payment of a commission under the circumstances described, but that intent is clearly not expressed. Harris testified that the 4 percent commission would be owing on any sale price, not just $303,995, but that intent is not clearly stated either. Further along, the agreement states:
 5) This agreement is enforceable only between owner [identified as Geyer/Beardsley] and Tomislav Podreka and or Linda Villano.
Obviously, neither Podreka nor Villano are parties to the agreement, so the above provision makes no sense as written, although it appears that perhaps the intent was to apply the commission only to a sale to one or the other of them.
Harris testified that she showed the One Oscaleta residence to Podreka and Villano, who were then husband and wife, at least three times beginning on April 6, 1996. Eventually, Podreka and Villano made a bid of $215,000 for the property and signed a binder agreement dated July 17, 1996. Harris was very reluctant to convey the bid to the owners, describing it as "really low," and told Podreka and Villano that bare building lots in Ridgefield were selling for more. Villano testified that Harris was rude and insulting about the low offer. In any event, the bid was conveyed to Geyer, who was described by Harris as upset, and who countered by lowering the sale price to either $285,000 or $297,000 CT Page 847 (Harris testified to the lower figure, Villano to the higher).
According to Villano, she and her husband were willing, even eager, to continue negotiations; however, the owner of Realty, Vi Szentkuti, called them the following Monday to say Realty was closing the books on the negotiations with Geyer and would return their binder check. Szentkuti told either Podreka or Villano that Realty was terminating the negotiations between them and Geyer, and that Realty anticipated receiving an exclusive listing for the One Oscaleta Road property and expected it to sell at or close to the listed price. At that time, Podreka told Szentkuti of their unhappiness with Harris' attitude. According to Harris, she received a note from Szentkuti to the effect that Podreka and Villano were very unhappy with her and did not wish to do any more business through her.
Substantive contact between Podreka and Villano on one hand and Realty and Harris on the other ended around July 23, 1996. Subsequently, according to Villano, she and her husband received information from another broker that One Oscaleta Road was not listed with any broker, and they were advised that they were free to contact Geyer. Apparently, that contact occurred in late August. Negotiations took place over a period of time, and a sale price of $260,000 agreed on.
According to Villano, when she was preparing to sign a contract with Geyer, her attorney advised her the property was in the name of Beverly Tuma of Thornwood, New York. The record contains a copy of a deed for One Oscaleta Road from Geyer and Beardsley to Tuma, recorded October 15, 1996. The deed reflects a sale price of $260,000, and there is evidence that Tuma assumed a $245,000 mortgage on the property. Villano purchased the property from Tuma for $260,000, and a deed to that effect was recorded on November 21, 1996.
Harris' recollection is somewhat different. She recollects that the time period between the end of her relationship with Podreka and Villano and when she learned of the sale to Tuma was about two and a half weeks. Additionally, she immediately concluded that there was a conspiracy to defraud her of a commission even before learning of the sale from Tuma to Villano.
Villano testified that during the time period she and her husband were negotiating with Geyer, they were in regular contact with an individual described as a financial advisor to Geyer, a George Galgano. It was Galgano who took over the major negotiation role for Geyer. Galgano also witnessed the deed from Tuma to Villano.
As noted above, defendants Tuma, Geyer and Beardsley were not present at CT Page 848 the trial to testify, and neither was Galgano.[1]
 DISCUSSION
Unfortunately, in adjudicating this case, the court is faced with the dual difficulties of confusing pleadings and very incomplete, if not a total lack of, evidence on certain key issues.
There are some facts such as the timing of the sales of the property to Tuma and Villano and the identical sales prices from which an inference might possibly be drawn that there was a conspiracy to avoid payment of a commission on the sale of One Oscaleta Road. Additional evidence might have put meat on the bones of this theory, but such was not forthcoming. Moreover, the testimony of Harris that a conspiracy existed is unpersuasive because (1) she had no direct knowledge, and (2) her conclusion preceded any state of facts which could support it. She based her conclusion on "facts" and impressions which are not supportive. For instance, two reasons given for the conclusion were that Podreka and Villano "dropped out of the picture" and did not return Harris' telephone calls. But these are not surprising consequences of the communications they had with Szentkuti to the effect that Realty was terminating the negotiations between them and Geyer. Harris also pointed to a complaint made by Villano to state authorities about her conduct. However, the complaint appears to be more of a reaction to the institution of Realty's lawsuit against Villano. Therefore, the court concludes that there is not sufficient credible evidence upon which to find a conspiracy existed.
The court also concludes that plaintiffs contract claim must fail because: (1) the contract as written is unenforceable against Geyer, and (2) Realty terminated the contract. As pointed out above, the contract language does not specifically obligate Geyer to pay a commission in circumstances where Realty did not negotiate the actual sale transaction. Additionally, crediting the testimony of Villano, the court finds that Realty terminated the negotiations with Podreka and Villano when the evidence indicates that both they and Geyer wished to continue to negotiate. In effect, Realty, apparently believing that the Podreka-Villano bid was too low and not competitive, took that couple off the table as potential buyers.
The plaintiffs cause of action under the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq., cannot be sustained. The plaintiff has not alleged that any of the activities complained of were performed as part of any defendant's conduct of trade or commerce. There was no evidence presented that any party, except the plaintiff, was in the business of selling, buying or negotiating about, real estate. See review of state and federal cases examining this issue CT Page 849 in Cornerstone Realty, Inc. v. Dresser Rand Co., 993 F. Sup. 107,111-113 (D.Conn. 1998).
The court turns now to the claims for quantum meruit asserted by plaintiff against all defendants. A quantum meruit claim seeks a form of restitution and is commonly employed where one seeks payment for work or services performed. A plaintiff may employ the theory only where no express contract exists covering the subject matter. Burns v. Koellmer,11 Conn. App. 375, 384 (1987). Therefore, plaintiff may not recover on that claim.
The court construes the second count of the complaint as a claim of unjust enrichment, another form of restitution. The fact that Realty had an express contract but cannot recover on it does not preclude recovery on the theory of unjust enrichment. Hartford Whalers Hockey Club v.Uniroyal Goodrich Tire Co., 231 Conn. 276 (1994). The essential underpinning of an unjust enrichment claim is that under a given fact situation, it would be contrary to equity and good conscience for someone to retain a benefit provided by another through services rendered without some recompense. Id. In this case, there were no services performed or benefit provided by Realty to either Tuma or Villano. Services were provided Beardsley and Geyer to the extent that Realty introduced an eventual buyer, Villano, to the One Oscaleta Road property. Under the circumstances, there does not appear to have been any knowing benefit accepted by Beardsley. The court finds, however, that a benefit was knowingly accepted by Geyer and that it would be inequitable not to pay for that benefit. Since the services provided by Realty terminated well before any sale took place and before the parties were even very close in price, the court determines that the benefit to Geyer was in the amount of $4500.
 CONCLUSION
Realty is awarded a judgment of $4500 against Geyer. Realty shall take nothing against the remaining defendants.
Adams, J.